IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| Gutter Topper, Ltd., | : | Case No. 1:05-CV-149 |
| | : | |
| Plaintiff, | : | District Judge Susan J. Dlott |
| | : | |
| v. | : | |
| | : | ORDER GRANTING PLAINTIFF'S |
| Sigman & Sigman Gutters, Inc., | : | MOTION FOR PARTIAL SUMMARY |
| d/b/a The Sigman Company, Inc. | : | JUDGMENT AND DENYING |
| d/b/a Sigman Gutters & Home Improvement, | : | DEFENDANTS' MOTION FOR |
| Inc., *et al.* | : | PARTIAL SUMMARY JUDGMENT |
| | : | |
| Defendants. | : | |

This matter comes before the Court on Plaintiff's Motion for Partial Summary Judgment (doc. 50) and Defendants' Motion for Partial Summary Judgment (doc. 52). Plaintiff Gutter Topper, Ltd. ("GTL") seeks summary judgment establishing liability against Defendants Sigman & Sigman Gutters, Inc. d/b/a The Sigman Company, Inc. d/b/a Sigman Gutters & Home Improvement, Inc. and William H. Sigman III (collectively, "Sigman") for breach of contract, trademark infringement and unfair competition. Sigman seeks summary judgment on the issue of damages. For the reasons that follow, the Court **GRANTS** GTL's motion and **DENIES** Sigman's motion.

I.  **FACTUAL AND PROCEDURAL BACKGROUND**

The Court derives this statement of facts from GTL's submission of Proposed Undisputed Facts (doc. 50 CM/ECF attachment #1), Sigman's submission of Disputed Facts (doc. 64 at 4-10), Sigman's Statement of Undisputed Facts (doc. 52 at 4) and GTL's Response to Defendants' Proposed Undisputed Facts and Disputed Issues of Material Fact (doc. 63-5), each

1

filed in accordance with this Court's Standing Order Governing Motions for Summary Judgment,[1] and the Court's review of the supporting admissible evidence.

GTL is an Ohio company engaged in the business of manufacturing gutter covers for private residences throughout the United States. GTL registered the trademark "Gutter Topper ®" in 1995 for use in connection with its products and has continuously used the trademark in interstate commerce since that time. GTL has invested time and money to develop a good reputation and goodwill in connection with the "Gutter Topper ®" trademark. GTL conducts its business nationwide by contracting with individual dealers through Dealer Agreements and permitting the dealers to sell "Gutter Topper ®" within their designated geographic areas.

Sigman & Sigman Gutters, Inc. is a corporation based near Atlanta, Georgia. William H. Sigman III is the president and owner of the company. Sigman entered into a Dealer Agreement with GTL on October 1, 2003, for a one-year automatically renewable term beginning August 1, 2003. The Dealer Agreement was automatically renewed for another year on August 1, 2004. The Dealer Agreement required Sigman to promote sales of the defined GTL products, including the "Gutter Topper ®" product. Section 4.10 of the Dealer Agreement prohibited Sigman from selling, distributing, promoting or designing, directly or indirectly, any product the same or similar to the "Gutter Topper ®" product or competitive with the "Gutter Topper ®" product. Section 8 of the Dealer Agreement limited Sigman's use of the "Gutter Topper ®" mark.

---

[1] The Court notes that Sigman did not comply with the specific format requirements of the Court's Standing Order and the Court has the discretion to strike Sigman's briefs for that reason. The Court will not impose that sanction here because the undisputed facts are clear and both motions are being resolved against Sigman's favor.

Section 9 gave GTL the right to terminate the Dealer Agreement if Sigman fell into arrears on its payments for more than 30 days.

Sigman fell into arrearage totaling approximately $66,000 on its account with GTL by the end of October 2004. GTL terminated its contract with Sigman for breach of Section 9 of the Dealer Agreement by a cease-and-desist letter dated November 5, 2004. GTL demanded in the letter that Sigman cease using its trademark and stated that it would view any further use by Sigman of its trademark after 30 days from the date of the letter, that is, after December 5, 2004, as a willful infringement.

Prior to the termination of the Dealer Agreement, the "Gutter Topper ®" product was the only gutter cover Sigman advertised. Sigman used GTL's trademark in its advertising on buildings, billboards, trucks, invoices, brochures, paperwork, and in the yellow pages. However, Sigman had begun to offer a competing gutter cover product called Siguard or Sig-Guard for sale along side the "Gutter Topper ®" product before November 5, 2004. Sigman admits that it sold at least 8,248 feet of a competing gutter cover product before the Dealer Agreement was terminated. On at least one occasion, the Sigman-made product was offered by the Sigman sales representative as the lower-priced alternative to the GTL product.

After December 5, 2004, Sigman continued to advertise GTL's product and trademark at least through January 21, 2005 on its website.

Also after December 5, 2004, Sigman issued contracts to customers named Edgar Crossett, Sharon Adams, John Seidl, Susan Ullmann, and Thomas Tudor indicating that Sigman was selling them the "Gutter Topper ®" product. Sigman points to additional records from the Crossett, Adams, Seidl, Ullmann and Tudor customer files that indicate that each was sold

3

Sigman's new gutter cover product called Gutter Guard, not the "Gutter Topper ®" product.

On other occasions, in paperwork after December 5, 2004, Sigman mixed up the GTL trademarked name with the Gutter Guard name as follows: "Gutter Guard topper" to Chris Barnett, "Sigman Topper" to John McAllister, "Dark Bronze Sigman Topper" to Deborah Moore, "Gutter Topper" and "Gutter Guard (topper)" to Rosa Mullis, and "Gutter Guard system topper" to Beverly Ojo and "GutterGuard Topper System" to Bobby Watford and to Lee Tanders. Sigman points out that each customer received an invoice that stated they were sold or were offered for sale the "Gutter Guard by Sigman."

The parties contest the facts and/or the implication from those facts for Sigman's sale of gutter covers to other customers.

GTL filed a Verified Complaint for Injunctive Relief and Damages ("Complaint") (doc. 1) against Sigman on March 11, 2005 stating multiple causes of action as follows:

> I. Injunction for Violation of Lanham Act, 15 U.S.C. § 1116 (trademark infringement)
> II. Damages for Violation of Lanham Act, 15 U.S.C. § 1114 (trademark infringement)
> III. Injunction for Violation of Lanham Act, 15 U.S.C. § 1125 (unfair competition)
> IV. Damages for Violation of Lanham Act, 15 U.S.C. § 1125 (unfair competition)
> V. Injunction for Violation of the Official Code of Georgia Annotated § 10-1-451 (trademark infringement)
> VII. Injunction for Violation of Georgia Uniform Deceptive Trade Practices Act, Official Code of Georgia Annotated § 10-1-370, *et seq.*
> IX. Injunction for Violation of Georgia Uniform Deceptive Trade Practices Act, False Advertising Statute, Official Code of Georgia Annotated § 10-1-420, *et seq.*
> X. Damages for Georgia Common Law Unfair Competition; and
> XI. Demand for Accounting and Damages for Breach of Contract.

(Doc. 1 at 6-19.) GTL voluntarily withdrew Counts VI and VIII, both state law claims, stating that they were duplicative of federal claims that remain. (Doc. 63 at 4 n.1.)

4

GTL now has moved for partial summary judgment on the issue of liability only for Counts II, IV, X, and XI. Likewise, Sigman has moved for partial summary judgment on the issue of damages as to Counts II, IV, X, and XI.[2] Both parties have filed briefs opposing each other's motions, but as is discussed in detail below, Sigman concedes liability at least in part.

## II. JURISDICTION AND LEGAL STANDARDS GOVERNING MOTIONS FOR SUMMARY JUDGMENT

The Court has jurisdiction over GTL's federal claims pursuant to 28 U.S.C. §§ 1331 and 1338 and over GTL's state law claims pursuant to 28 U.S.C. § 1367. (Doc. 29.)

Federal Rule of Civil Procedure 56 governs motions for summary judgment. Summary judgment is appropriate if no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. See Fed. R. Civ. P. 56(c). On a motion for summary judgment, the moving party has the burden of showing that no genuine issues of material fact are in dispute, and the evidence, together with all inferences that can permissibly be drawn therefrom, must be read in the light most favorable to the party opposing the motion. See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 585-87 (1986).

The moving party may support a motion for summary judgment with affidavits or other proof or by exposing the lack of evidence on an issue for which the nonmoving party will bear the burden of proof at trial. See Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986). In responding to a summary judgment motion, the nonmoving party may not rest upon the pleadings but must go beyond the pleadings and "present affirmative evidence in order to defeat a properly supported motion for summary judgment." Anderson v. Liberty Lobby, Inc., 477 U.S.

---

[2] Sigman also moved for summary judgment as to damages regarding the two causes of action that have now been withdrawn. Sigman's motion as to those claims has been mooted.

242, 257 (1986). The nonmoving party "must set forth specific facts showing there is a genuine issue for trial." Fed. R. Civ. Pro. 56(e). The Court's task is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Liberty Lobby, 477 U.S. at 249. A genuine issue for trial exists when there is sufficient "evidence on which the jury could reasonably find for the plaintiff." Id. at 252.

**III.     ANALYSIS**

**A.      GTL's Motion for Partial Summary Judgment on Liability**

    **1.      Breach of Contract**

The Court will begin, as did the parties, with GTL's breach of contract cause of action. Preliminarily, there is no dispute that the parties entered into a contract. Sigman has not alleged that GTL failed to perform its obligations under the contract. Therefore, the issue is whether Sigman breached the Dealer Agreement. See Doner v. Snapp, 98 Ohio App.3d 597, 600, 649 N.E.2d 42, 44 (1994) (listing elements of breach of contract in Ohio as the existence of a contract, performance by the plaintiff, breach by the defendant, and damage or loss to the plaintiff). Sigman concedes in its Statement of Undisputed Facts that it breached Section 4.10 of the Dealer Agreement by selling 8,248 feet of a competing gutter cover product prior to the termination of the Dealer Agreement. GTL, however, asserts that Sigman breached the Dealer Agreement in other ways as well and the Court will address those assertions.

First, GTL asserts and William H. Sigman III testified that Sigman breached the contract in 2004 when its account balance fell into arrears in the amount of approximately $66,000. Pursuant to Section 9 of the Dealer Agreement, GTL was authorized to terminate the contract upon that breach. (Doc. 50 ex. A.)

Second, GTL asserts that Sigman used the "Gutter Topper ®" mark in a manner beyond what was authorized by Section 8 of the Dealer Agreement. Section 8 stated that Sigman had the "non-exclusive right to use the trademark and service mark 'GUTTER TOPPER ®' . . . solely in connection with the sale of the Products" and further that Sigman could not use the trademark "or any words or marks confusingly similar thereto in connection with the manufacturing, packaging, use, sale or distribution of any product or services, or in any manner, not authorized by GTL." (Id.) It is undisputed that the only gutter cover product that Sigman advertised prior to November 5, 2004 was the "Gutter Topper ®" product. Former Sigman sales representative Paul Perry testified that he told customers prior to this date that "if you can't afford the Gutter Topper, we got another product." (Perry Depo. at 22.) Sigman customer Ed Stinson testified that he contacted Sigman on or around September 1, 2004 with the intention of purchasing the "Gutter Topper ®" product, a product he knew Sigman sold due to his familiarity with their marketing and advertising. (Stinson Depo. at 7-11.) The Sigman representative offered to sell Stinson a Sigman proprietary product for less money when Stinson objected to the quoted price of the "Gutter Topper ®" product. (Id. at 16-18.) Stinson ultimately purchased the Sigman gutter cover product. (Id. at 21-22.) Sigman offers no evidence to dispute the testimony of either Perry or Stinson. The Court finds that Sigman violated Section 8 of the Dealer Agreement by using the "Gutter Topper ®" mark to attract customers to whom Sigman then attempted to sell its competing product.

In sum, the Court finds that there are no material issues of fact in dispute and GTL has

established as a matter of law that Sigman breached the Dealer Agreement.[3]

### 2. Trademark Infringement and Unfair Competition

GTL alleges that Sigman violated federal law (15 U.S.C. §§ 1114[4] and 1125[5]) and the

---

[3] In finding breach of contract for the reasons stated above, the Court does not intend to define or limit the scope of the evidence that GTL could present to the trier of fact to prove its breach of contract damages.

[4] The federal trademark infringement statute provides in relevant part:

> (1) Any person who shall, without the consent of the registrant--
>
> (a) use in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive . . .
>
> shall be liable in a civil action by the registrant for the remedies hereinafter provided.

15 U.S.C. § 1114.

[5] The federal unfair competition statute provides in relevant part:

> (1) Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which--
>
> (A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, or
> (B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities,
>
> shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

15 U.S.C.A. § 1125.

Georgia common law prohibiting unfair competition. As pointed out by GTL, federal trademark infringement and unfair competition claims are analyzed together. Autozone v. Tandy Corp., 373 F.3d 786, 791-92 (6th Cir. 2004); Too, Inc. v. TJX Companies, Inc., 229 F.Supp.2d 825, 829 (S.D. Ohio 2002). Likewise, federal courts also have applied the same analysis to Georgia common law unfair competition claims. See Jellibeans, Inc. v. Skating Clubs of Georgia, Inc., 716 F.2d 833, 839 (11th Cir. 1983) (stating that the district court so found and that the parties did not challenge the finding on appeal); Amstar Corp. v. Dominos Pizza, Inc., 615 F.2d 252, 258 (5th Cir. 1980) (stating that federal trademark infringement analysis applies to the Georgia common law unfair competition claim).

To establish liability, a plaintiff must prove "(1) that it owns a valid, protectable trademark; (2) that the defendant used the mark in commerce and without the registrant's consent; and (3) there was a likelihood of consumer confusion." Too, Inc., 229 F.Supp.2d at 829. The essence of either claim is "whether the defendant's use of the disputed mark is likely to cause confusion among consumers regarding the origin of the goods offered by the parties." Autozone, 373 F.3d at 791 (citation omitted). It is not necessary to prove intent to establish likelihood of confusion. Autozone, 373 F.3d at 799; see also Too, Inc., 229 F.Supp.2d at 829 (stating that a defendant's good intention does not preclude liability).

Turning now to the facts in this case, GTL asserts that Defendant Sigman conceded liability in its Memorandum in Opposition to GTL's motion by stating that the "issues in Plaintiff motion are *damages* for Trademark Infringement." (Doc. 64 at 2 (emphasis added).) Elsewhere, however, Sigman refers to the "alleged infringement." (Id. at 4.) The Court will assume that Sigman intended to contest liability.

9

There is no dispute that GTL had a valid trademark for "Gutter Topper ®." See Too, Inc., 229 F.Supp.2d at 829 (first element of liability analysis).  Likewise, the evidence establishes that Sigman used the trademark in commerce and without GTL's consent.  See id. (second element of liability analysis).  As discussed in the previous section regarding the breach of contract claim, prior to November 5, 2004, Sigman used the mark in a manner not permitted by the Dealer Agreement.  Sigman used the "Gutter Topper ®" trademark as its sole advertising for gutter cover products, but then attempted to sell customers its own Sig-Guard product.  Additionally, after December 5, 2004 (after the 30 days grace period stated in the cease-and-desist letter), Sigman continued to use GTL's mark in the sales materials that it presented to at least some customers.  The purchase contracts signed by Sigman customers Edgar Crossett, Sharon Adams, John Seidl, Thomas Tudor, and Susan Ullman all stated that they were purchasing "Gutter Topper ®" gutter covers.  Sigman argues in its brief that the name "Gutter Topper ®" appeared as the result of errors and mistakes.  This attorney argument is not admissible evidence on a motion for summary judgment.  The fact that other invoices or documents in each customers' file stated that they had purchased "Gutter Guard by Sigman" does not negate the fact that Sigman used the GTL trademark name in the customer contracts without authorization.  Moreover, Sigman did not remove the "Gutter Topper ®" mark from its website until some time after January 21, 2005.  These facts establish Sigman's use of the trademark without GTL's consent.

Turning to the third element, the undisputed evidence establishes a likelihood of customer confusion by Sigman's use of the GTL's trademark before and after the Dealer Agreement was terminated.  See id. (third element of liability analysis).  Courts in the Sixth

Circuit examine and balance eight factors to evaluate the likelihood of confusion:

>1. strength of the plaintiff's mark;
>2. relatedness of the goods;
>3. similarity of the marks;
>4. evidence of actual confusion;
>5. marketing channels used;
>6. likely degree of purchaser care;
>7. defendant's intent in selecting the mark;
>8. likelihood of expansion of the product lines.

Frisch's Restaurants, Inc. v. Elby's Big Boy of Steubenville, Inc., 670 F.2d 642, 648 (6th Cir. 1982). Not all of the factors may be helpful or relevant in a given case and there is no precise formula for weighing the factors. See Autozone, 373 F.3d at 786 (stating that the factors "imply no mathematical precision" and that "not all of these factors may particularly helpful in a given case").

The evidence that GTL's mark is strong includes its continuous use since 1995 and the fact that Ed Stinson solicited Sigman for the purpose of purchasing the "Gutter Topper ®" product. The testimony of William Sigman and Paul Perry establishes that Sigman sold gutter covers that were in direct competition with the "Gutter Topper ®" and establishes the relatedness of the goods factor. (Sigman Depo. at 98-99; Perry Depo. at 18-19, 22-23.) Prior to November 5, 2004, Sigman advertised gutter covers using only the "Gutter Topper ®" mark and any sales leads it generated were a result of that mark; yet Sigman representatives then attempted to sell the Sigman proprietary product. (Sigman Depo. at 110; Perry Depo. at 22.) Lastly, there is ample evidence that Sigman provided customers either with documentation that used both the "Gutter Topper ®" and Gutter Guard names, or that combined the two names in a confusing fashion. Sigman has not refuted with admissible evidence these facts that support a finding that a likelihood of confusion existed. Therefore, the Court finds that GTL is entitled to judgment as

11

a matter of law as to liability on its federal trademark infringement and unfair competition claims and the Georgia common law unfair competition claim.[6]

**B.    Sigman's Motion for Partial Summary Judgment on Damages**

Having examined the parties' briefs on the issue of damages, the Court finds that genuine issues of material fact remain which preclude summary judgment.

**IV.    CONCLUSION**

For the foregoing reasons, the Court hereby **GRANTS** Plaintiff's Motion for Partial Summary Judgment (doc. 50) and **DENIES** Defendants' Motion for Partial Summary Judgment (doc. 52).

IT IS SO ORDERED.


       s/Susan J. Dlott
Susan J. Dlott
United States District Judge

---

[6] In finding Sigman liable for trademark infringement and unfair competition for the reasons stated above, the Court does not intend to define or limit the scope of the evidence that GTL could present to the trier of fact to prove its damages.